UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

ROUTEWARE, INC., a
Delaware corporation,                           Civil Action No.:

      Plaintiff,                              **Preliminary and Permanent
                                                Injunctive Relief Requested**

vs.

JOHN CARVER, an individual                      **Demand for Jury Trial**
Florida resident,

      Defendant.
_____/

## COMPLAINT FOR BREACH OF CONTRACT

Plaintiff Routeware, Inc. ("Routeware" or "Plaintiff"), by and through its

attorneys, for its Complaint against Defendant John Carver ("Carver" or

"Defendant"), alleges as follows:

### PARTIES

1.    Plaintiff Routeware is a Delaware corporation, and at all relevant

times, has had its principal place of business in Portland, Oregon.

2.    Defendant Carver is an individual residing in Saint Johns, Florida.

### JURISDICTION AND VENUE

3.    This Court has subject matter jurisdiction over this action based upon

diversity of citizenship pursuant to 28 U.S.C. § 1332(a)(1) because this action is

between a Plaintiff that is a citizen of Delaware and Oregon, and a Defendant who

is a citizen of Florida; and the amount in controversy exceeds $75,000, exclusive of interest and costs.

4.      This Court has personal jurisdiction over Carver because he resides within this District, and because Routeware's causes of action arise directly from Carver's business contacts and other activities in the State of Florida and this District.

5.      Venue is proper in this District under 28 U.S.C. §1391(c). Venue is also proper in this District by consent because Routeware's predecessor-in-interest, Core Computing Solutions, Inc. ("Core"), and Carver entered into a contract (the "NSCA Agreement"), in which they agreed that "The venue for any litigation or arbitration arising under this Agreement shall be Duval County, Florida" and that the agreement "shall be interpreted under Florida law."   A copy of the NSCA Agreement is attached hereto as **Exhibit "A."**

<u>**GENERAL ALLEGATIONS**</u>

**A.      Routeware's Business, Carver's Employment, and the NSCA Agreement**

6.      Founded in 1999, Routeware is a provider of on-board computers and software solutions to the solid waste and fleet industries. Routeware's integrated software solutions provide smart cities and private haulers with capabilities including fleet automation, back-office and billing, route optimization, and digital communication and education tools. Headquartered in Portland, Oregon, the

company has offices and customers throughout the United States, the United Kingdom, and Canada. Routeware pioneered a system that automates route adjustments, truck locations, and pick-up/drop-off activity and makes its customers' trucks become rich data collectors, feeding everything they're doing back to the office in real-time. Using Routeware's powerful reporting tools, customers can see exactly what's unfolding on every route. This kind of visibility leads to cost savings, route consolidation, better driver management, reduction of paperwork, and increased revenue.

7.     Routeware has made a number of strategic acquisitions of other companies with complementary technology.  On February 7, 2020, Routeware acquired Core, a Jacksonville, Florida-based company, and controls all of Core's assets and agreements.  Founded in 2003, Core developed and sold one of the most trusted enterprise resource planning (aka "ERP") solutions for waste management, known as "Encore." The Encore software solution bills and manages customers, tracks materials and inventory, and can report on nearly every aspect of customers' financial and operational activities.  The Encore software helps customers manage fleets, automate workflows, optimize routes, and provide self-service options to their own customers. Following its acquisition in February 2020, Core became one of Routeware's managed brands.

8.     Defendant Carver joined Core in 2014 as a technical support representative at its Jacksonville, Florida location. In his role as a technical support representative, Carver would work with customers to troubleshoot problems, understand their system needs, and identify new solution features that were in demand. As a result of performing his duties, Carver gained knowledge of confidential customer information that Core had invested years of time and effort to develop, including information about customers actual and potential use cases, internal infrastructure and solution architecture, and information about key decision makers and budget allocations for Core's solution.  Over time, as part of his work for Core, Carver developed particularly strong relationships with some of Core's customers.

9.     Core had an employee base of fewer than 20 people.  As a result, employees often took on an array of responsibilities.  This was true for Carver, who, over time, was tasked with additional responsibilities beyond his technical representative duties.   These new responsibilities included setting up the company's data room (which hosted the servers running the Encore solution) and a number of other critical system administration duties. Carver was one of only a few Core employees (along with CEO, Nate Piersall, and CTO, Scott Piersall) who had administrative level access to Core's internal systems, applications, and infrastructure.

10.    As part of his system administration responsibilities, Carver was given access to "installer disks" for the Encore solution.  The Encore software is the crown jewel of Core's business and its primary product (Core, and now Routeware, offers hosting and support services for the Encore solution).  Core and Routeware have maintained strict control over the Encore code and installer disks, limiting their use to only a handful of personnel, including Carver. Security measures included limiting access to Core's (and later, Routeware's) facilities, training employees on the value of the Encore software and the importance of limited access to the code, limiting the number of employees with access to the Encore installer disks, using a managed security provider with live monitoring, completing external and internal penetration testing, maintaining a limited number of administrator accounts in infrastructure and all internally used systems, and tracking any unauthorized use of the Encore software through various internal resources.

11.    Over the course of his years of work, Carver was entrusted with scores of other company confidential, proprietary, and trade secret documents, data, and information. This included confidential, proprietary, and trade secret information about Encore product customers, including information about customer infrastructure, technical issues, use cases, vulnerabilities, priorities, and preferences.

12.     In recognition of the fact that Carver was entrusted with significant Core property and information as a result of his employment and in consideration of his employment and other benefits afforded him, Carver executed the above-noted NSCA Agreement.  Pursuant to the "Recitals" to that agreement, Carver acknowledged that "[i]n connection with his[] employment and/or continued employment with Company, [Carver] will receive and/or continue to receive valuable training, advice and support, as well as exposure to the Company's confidential and proprietary information."

13.     The NSCA Agreement includes several restrictive covenants, including one in which Carver promised not to "solicit or accept business from" actual or prospective customers for two years after leaving employment and further agreed that "for a period of five (5) years" following termination of his employment," he agreed not to "use, disclose, or divulge any Confidential Information for a purpose other than the Company's business except upon the written authorization of the Company." *See Exhibit A* ¶¶ 2(c), 4(b).

14.     Specifically, the NSCA Agreement provides, in relevant part:

**2. Covenants Against Competition and Solicitation** . . . (c) Employee further agrees that for a period of two (2) years after the termination of his/her employment for any reason whatsoever, he/she shall not, directly or indirectly, on behalf of him/herself or others, solicit or accept business from, direct marketing activities to, or perform services for, any Customer or Prospective Customer.  The prohibition herein shall be limited to the Field of Business.

**4. <u>Covenants Concerning Confidentiality</u>** . . . (b) Employee agrees that, during the term of his/her employment with the Company, and for a period of five (5) years following the termination of his/her employment for any reason whatsoever, he/she shall not use, disclose, or divulge any Confidential Information for a purpose other than the Company's business except upon the written authorization of the Company.  The temporal restriction for Trade Secrets shall be extended indefinitely until the time at which the information ceases to be a Trade Secret.

*Id.*, ¶¶2(c), 4(b).

15.     The NSCA Agreement defines the terms "Confidential Information," "Customer," and "Field of Business" as follows:

**a.** "**<u>Confidential Information</u>**" means all data and information relating to the business of the Company that is not generally known to the public.  Confidential Information includes, for example, Trade Secrets . . . customer information . . . intellectual property . . . and similar information that a reasonable employer such as the Company would consider to be confidential.

**b.** "**<u>Customer</u>**" means any person or entity to whom the Company sells or sold its products and/or services during the twenty-four (24) month period preceding the Employee's last day of work for the Company.

**c.** "**<u>Field of Business</u>**" means (i) the design, manufacture, marketing, sale, and/or distribution of software and related technology used in waste management, recycling, and other industries, (ii) support services related to such software and technology, and (iii) any other business in which the Company engaged during Employee's employment and a period of twelve (12) months prior to such employment.

*Id.*, ¶¶ 1(a)-(c).

16.     Carver's agreement to abide by those covenants post-separation would become important in August 2021, when he was terminated.  As noted

above, Core was acquired by Plaintiff Routeware in February 2020.  Following the acquisition, the Jacksonville data center was decommissioned and many of Carver's system administration responsibilities were no longer needed.

**B.    Carver's Termination, the Ransomware Attack, and Carver's Breach of the NSCA Agreement's Restrictive Covenants**

17.     On August 30, 2021, Carver's employment was terminated.

18.     The NSCA Agreement required Carver to return "in good condition all original and copied records, files, and other property of the Company in his/her custody, control, or possession, including, without limitation, the information identified in Section 1 as Confidential Information."  On information and belief, Carver did not surrender all records, files, and other property and, at a minimum, wrongfully retained at least one copy of the Encore software.

19.     The NSCA Agreement also prohibits Carver from offering his services to any company that was an actual or prospective customer for a period of two years following termination.   On information and belief, Carver – without providing notice to, or obtaining authorization from, Routeware – offered his services with respect to the Encore software solution to at least one Routeware customer, Tri-State Disposal, Inc. ("TSD"), within approximately three months of his termination.

20.     On November 16, 2021, several months after Carver was let go, Routeware suffered a ransomware attack on the Encore solution. In general,

ransomware is a type of malware designed to deny a user or organization access to files on their computer or systems. By encrypting these files and demanding a ransom payment for the decryption key, cyberattackers place organizations in a position where paying the ransom is the easiest and cheapest way to regain access to their files. The November 16 ransomware attack took down Routeware's ability to support the use of the Encore solution by its customers. Although employees worked around the clock to halt the proliferation of the attack and bring the Encore systems back up, it would ultimately take 16 days to do so.

21.     Shortly after the ransomware attack began, on or about November 17, 2021, Carver reached out to Core's founder, Nate Piersall, to communicate that he had heard about the attack and to offer his help. It is unclear how Carver learned of the ransomware attack so quickly. Notably, when Carver was still an employee, he insinuated to colleagues that he had the capacity to take the Encore solution down on his whim and believed himself to be essentially "untouchable" as an employee. Nate Piersall did not take Carver up on his offer of help. Around this same time, Carver made inquiries to several other Routeware employees about the ransomware attack but the company did not accept his help with the attack.

22.     During the 16-day ransomware outage, some of Routeware's customers, including specifically Carver's former account, TSD, expressed frustration at Routeware's inability to provide a temporary workaround to its

customers.  In particular, early in the attack, TSD's Chief Operating Officer, Jeff Germany ("Germany"), published at least one public social media post to Facebook criticizing Routeware's response.  He also responded to customer email updates from Routeware, complaining to the other customers on the email updates about Routeware's response.

23.     On information and belief, Carver, who had worked with Germany as the Encore technical support representative for the TSD account at Core and Routeware, communicated with Germany on November 17, 2021.  On information and belief, that same day, Germany sent Carver his proposed Facebook post describing the ransomware attack and its impact on TSD's business.

24.     On information and belief, Carver and Germany discussed a plan for running Encore on infrastructure other than Routeware's infrastructure as a bridge while Routeware worked to repair its servers and restore access to Encore. Carver, on information and belief, told Germany that he had a copy of the Encore software and that he could load it onto servers controlled by TSD.  On information and belief, Carver also told Germany that other, unnamed, Routeware customers had instances of Encore running on their own onsite servers. Carver knew or reasonably should have known that he was not authorized to have a copy of the Encore software and had no authority to load it on onsite or virtual servers for Routeware customers.

25.     On information and belief, Carver knew from his technical support work with TSD that it had set up an Amazon Web Services ("AWS") account in May 2019 but had never used it.   On information and belief, on or around November 17, 2021, Carver asked Germany if TSD still had its AWS account and suggested that he could load Encore onto AWS. On information and belief, TSD accepted Carver's offer.

26.     On information and belief, Carver loaded a version of the Encore solution onto an AWS virtual machine using TSD's AWS account sometime between November 17 and 26, 2021.

27.     On November 23, 2021, TSD's Germany sent Routeware's CEO, Tom Malone, an email demanding a copy of TSD's Encore dataset. On information and belief, Germany blind copied Carver on this email. Over the next few days, Germany made additional requests for TSD's dataset to Mr. Malone and other Routeware employees. Routeware did not provide the requested dataset to TSD at that time.

28.     On November 26, 2021, on information and belief, Carver gave Germany access to the Encore software database he set up for TSD on AWS. That same day, Germany again asked Mr. Malone to deliver a copy of Tri-State's data and, on information and belief, Germany forwarded Carver a copy of his email to Mr. Malone.

29.     Also on November 26, 2021, a Routeware employee named Jed Dawson was reviewing error logs in Sentry (a cloud hosted log aggregation service) to check application health. He noticed a machine name – "TSD-APP" – on the error log that was not part of Routeware's infrastructure. Dawson reviewed the error logs for TSD-APP and found that "JohnC" and "JeffG" were the only two "users" logged in reference to the "TSD-APP" machine. The logs showed a login attempt on November 26, 2021 at 8:05 p.m. PST for the "JohnC" user and at 8:13 p.m. PST for the "JeffG" user. On information and belief, the users "JohnC" and "JeffG" correspond to John Carver and Jeff Germany's Encore login credentials, respectively. The error that was being stored was caused because the Encore application running on TSD-APP could not reach the updated server during start up, so each time the user launched the Encore application on TSD-APP, an error was stored. Dawson reported these findings to Nate Piersall, Tom Malone, and George May (Vice President of Operations at Routeware and Carver's former supervisor) that same evening.

30.     On November 30, 2021, on information and belief, Carver told Germany, "I have it all setup and working. All we need is the data and then I can setup the users in AD and they will be able to login after we add the IP to the office and your house. If you have a PC there I can test all this out if you want."

31.     On December 1, 2021, Germany asked Routeware's Vice President of Finance and Accounting, Shanna Peralta, when Routeware would provide TSD with its requested dataset. In response, Routeware sent Germany a chart with questions about the software/database that (unbeknownst to Routeware) Carver had installed for TSD. On information and belief, Germany, with secret assistance from Carver, responded to the questions later that same day.

32.     In early December 2021, Nate Piersall called and asked Germany about the TSD-APP machine Jed Dawson had identified a week earlier. On information and belief, Germany promptly called Carver and told him that Routeware had discovered the TSD-APP machine and knew that Germany and Carver's login credentials were used in connection with the machine. Carver told Germany, on information and belief, that "TSD-APP" was the name he had given the AWS server hosting the Encore software/database that he had installed for TSD in November. On information and belief, Carver told Germany that he deleted the Encore software/database from TSD's AWS account shortly after that phone call.

33.     Jeff Germany has submitted a sworn affidavit dated March 23, 2022 attesting to the allegations regarding his communications with John Carver in November and December 2021.

34.     Neither Carver, TSD, nor Germany had Plaintiff's permission to install and/or run the Encore software, whether on TSD's machines, or on any other servers in November or December 2021.

35.     Carver breached the NSCA Agreement, as a non-exhaustive example only, by using confidential information he learned about TSD and its infrastructure during his tenure at Plaintiff to offer his services to TSD within two years of leaving Routeware.  He also breached the NSCA Agreement, as a non-exhaustive example only, by maintaining, loading, and running the Encore program after he was terminated, including for the benefit of TSD.

36.     Routeware has been damaged and continues to suffer damages as a result of Carver's malfeasance, including losing the TSD account.  Routeware has also been and continues to be irreparably harmed by Carver's breaches of the NSCA Agreement's restrictive covenants.

37.     Routeware was forced to devote substantial employee resources to identifying and tracking down who was responsible for the unauthorized "TSD-APP" machine. Germany, TSD, and Carver intentionally concealed, misdirected, and misrepresented both whether TSD was making unauthorized use of an unauthorized copy of Encore and who or what the source of that unauthorized Encore software was, which further added to the work Routeware's employees had to conduct in order to determine what had actually occurred.

38.     Furthermore, on information and belief, Carver told Germany that other customers were also running unauthorized copies of Encore onsite but Routeware has not been able to identify any of those customers to date.   On information and belief, Carver destroyed critical evidence – the copy of Encore that he installed on TSD's AWS virtual machine – upon learning that Routeware suspected his involvement in TSD's use of an unauthorized Encore copy.

39.     As a direct and proximate result of Carver's illicit and unauthorized provision of services to TSD and unauthorized possession and use of the Encore software, Routeware has incurred actual damages in excess of $12,000 in internal employee costs in investigating the source of TSD's use of the Encore software during the ransomware attack. In addition, as a direct and proximate result of Carver's unauthorized services provided to TSD, Routeware lost the TSD account. At the time of the breach, TSD had been a Core/Routeware customer for over ten years and Routeware had every expectation that TSD would continue to be a customer for at least another ten years but for Carver's breach of the NSCA Agreement in offering and actually providing unauthorized services to TSD during the ransomware attack.  Routeware reasonably expected at least another $475,000 in profits from the TSD account but for the Carver breaches. Routeware has incurred damages in an amount to be determined at trial but no less than $487,000.

40.     Core and Routeware have invested millions of dollars in developing the Encore software.  On information and belief, Carver had at least one copy of the Encore software following his termination from Routeware and has demonstrated his willingness to make unauthorized use of that software while concealing that use from Routeware.  If Routeware is unable to recover the Encore software in Carver's possession, it risks losing the entire value of the Encore software since Carver (or anyone else he shares the code with) could release the software on the Internet for free or sell unauthorized copies on the black market. This would give actual and prospective customers an alternate (albeit, insecure) means of using the Encore software and provide Routeware's competitors with the complete code to the Encore solution, rendering all of Core and Routeware's substantial investments in security for the Encore software worthless.

41.     Routeware has suffered and will continue to suffer irreparable harm so long as Carver maintains an unauthorized copy or copies of the Encore software. Routeware does not know if or how or where Carver has secured one or more copies of the code.

42.     If a copy of the code were to fall into unauthorized hands, Routeware risks losing all value of the Encore solution and services.  A bad actor with a copy of the Encore software could insert malware in the code to steal information from users who install the software, believing (wrongly) that it is a legitimate copy of

the Encore code.  This could not only result in harm to putative customers but would cause untold reputational harm and loss of goodwill to Routeware, with injured users potentially looking to the company to make them whole for their use of software they may have believed to have purchased from a legitimate source. Unless and until all copies of the Encore code are secured, Plaintiff is at imminent risk of any or all of the above.

43.     In addition, on information and belief, Carver deleted the copy of the Encore software he installed on TSD's AWS virtual machine when Germany told him that Routeware knew about the TSD-APP machine and was retaining counsel. Unless and until injunctive relief is granted, Routeware remains at risk of losing access to valuable forensic and other evidence that Carver has or may destroy.

**C.     Allegations Supporting Injunctive Relief Remedy**

44.     Plaintiff has suffered irreparable harm due to Carver's refusal to comply with the restrictive covenants at Sections 2(c) and 4(b) of the NSCA Agreement.  Plaintiff will continue to suffer such irreparable harm unless the Court issues a preliminary and permanent injunctive relief. Plaintiff expects to file a separate motion for preliminary injunctive relief expeditiously.

45.     Carver breached the NSCA Agreement Section 2(c) covenant against solicitation by offering and performing services to TSD related to the Encore software within two years of his separation from Plaintiff.  Per the NSCA

17

Agreement, Section 2(c), and Florida Statute § 542.335(1)(j), Plaintiff is entitled to a presumption of irreparable harm.

46.    Carver maintained, and on information and belief, still possesses Plaintiff's confidential information, including, but not limited to, confidential, proprietary, and trade secret information and at least one copy of the Encore software.

47.    Carver used such information at least for the benefit of TSD and without authorization from Routeware.  By maintaining, using, and disclosing Plaintiff's confidential, trade secret, and proprietary information, Carver breached the NSCA Agreement Section 4(b) confidentiality covenant.  Carver's unauthorized installation of the Encore code on TSD's virtual AWS machine(s) breached the NSCA Agreement Section 4(b) and Plaintiff is entitled to a presumption of irreparable harm under Florida Statute § 542.335(1)(j).

48.    Plaintiff continues to be in jeopardy of further harm as long as Carver remains wrongfully in possession of or able to access one or more unauthorized copies of the Encore software and any other confidential information he retained from his tenure at Plaintiff.

49.    Carver knowingly and intentionally assisted TSD in misleading and deceiving Plaintiff about his breaches of the NSCA Agreement's restrictive covenants.  On information and belief, Carver assisted TSD in providing obtuse,

misleading, and incomplete information in order to mislead Plaintiff about the source of the Encore software TSD intended to use during the ransomware attack. On information and belief, Carver also assisted TSD in misleading Plaintiff and omitting material information about where and how TSD intended to install and run the Encore software during the ransomware attack.

50.     On information and belief, Carver intentionally destroyed the unauthorized version of the Encore software that he installed and ran on the TSD's AWS virtual machine for purposes of concealing his breaches of the restrictive covenants in the NSCA Agreement.  On information and belief, Carver destroyed such evidence even though he knew or should have known that litigation on this subject was both likely and imminent.

51.     Unless the Court orders the injunctive relief, Plaintiff will continue to suffer irreparable harm.

52.     Routeware has retained the undersigned counsel to represent its interests in this action and has agreed to pay counsel a reasonable fee for its services. Routeware is entitled to its reasonable attorneys' fees, court costs, and other expenses incurred in connection with this action pursuant to Section 542.335(1)(k), Florida Statutes.

53.     All conditions precedent to the filing of this action have been met or have been waived by the parties.

## COUNT I – BREACH OF CONTRACT
## (RESTRICTIVE COVENANTS)

54.     Routeware realleges and incorporates paragraphs 1 through 53 above

as if fully recited herein.

55.     On April 13, 2018, Core and Carver entered into the written NSCA

Agreement (Exhibit A).  As set forth above, due to its February 2020 acquisition of

Core, Routeware obtained rights to enforce the NSCA Agreement.

56.     The NSCA Agreement contains valid and enforceable restrictive

covenants at Sections 2(c) and 4(b).  Among other things, the NSCA Agreement

prohibited Carver from, among other things:  (1) directly or indirectly, on behalf

of himself or others, solicit or accept business from, direct marketing activities to,

or perform services for any [Routeware] customer or prospective customer for the

two years following his separation from [Routeware]; and (2) using, disclosing, or

divulging [Routeware] confidential information for a purpose other than

[Routeware's] business except upon written authorization for the five years

following his separation from [Routeware]. *See* Exhibit A.

57.     Carver materially breached Section 2(c) of the NSCA Agreement by

offering his services to Routeware customer TSD within three months of his

separation from Routeware and by installing and running an unauthorized

version of the Encore software without Plaintiff's authorization.  Carver further

violated Section 2(c) by, in fact, performing those services for TSD.  Carver also

violated the Section 4(b) confidentiality covenant at least by using, disclosing, and divulging the Encore code for the benefit of TSD using one or more of TSD's virtual AWS machines; by not returning all company confidential information and property post-termination; using a copy of the Encore software, which comprises Plaintiff's proprietary, confidential, and trade secret information; and by using confidential information and knowledge about how the Encore software operates within TSD's infrastructure and architecture, among other related acts.  Carver further violated – and continues to violate – Section 4(c) by maintaining Plaintiff's confidential and trade secret information, including, but not limited to, the confidential, proprietary, and trade secret information comprising the Encore software.

58.    As a proximate result of Defendant Carver's breaches of the NSCA Agreement, Routeware has suffered and will continue to suffer substantial damages in an amount that exceeds at least $487,000, the exact amount to be determined at trial.

59.    Defendant Carver has and will, unless and until enjoined and restrained by an order of this Court, continue to cause great and irreparable injury to Routeware's business in that he will be able to unfairly compete with Routeware and to interfere with and destroy the value of its Encore software (and any other confidential, proprietary, and trade secret information still in Carver's possession)

through his continued unauthorized use and disclosure of such code and information, including to actual and prospective Routeware customers.

60.     Routeware has no adequate remedy at law for these injuries because the damage to Routeware's actual and potential business advantage, including to its confidential, proprietary, and trade secret information, cannot adequately be compensated through monetary damages.  As a result, this Court should compel specific performance of Defendant Carver's contractual obligations.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff Routeware respectfully requests judgment against Carver as follows:

a)     For a preliminary and permanent order enjoining Defendant Carver from (i) offering, whether directly or indirectly, on behalf of himself or another, (ii) soliciting or accepting business from, (iii) directing marketing activities to, and (iv) performing services for, any actual or prospective Routeware customer, and further be enjoined from using, disclosing, or divulging Routeware confidential, proprietary, trade secret information, including, specifically, the Encore software.

b)     For an order requiring Carver to return to Routeware all of its confidential, proprietary, and trade secret documents in his possession, custody, or control, including, specifically the Encore software;

c)      For an award of compensatory damages of in an amount to be proven at trial but at least in the amount of $487,000;

d)      For any and all further appropriate equitable relief;

e)      For an award of punitive or exemplary damages;

f)      For its reasonable attorneys' fees;

g)      For prejudgment and postjudgment interest at the maximum rate allowed by law on all amounts claimed;

h)      For costs of suit incurred herein; and

i)      For such other and further relief, including any statutory relief, as the Court deems just and proper.

## JURY TRIAL DEMANDED

Plaintiff Routeware, Inc. demands trial by jury on any issues so triable.

Dated this 8th day of June, 2022.

[SIGNATURES APPEAR ON NEXT PAGE]

Respectfully submitted,

By: /s/ Francesca Russo

Francesca Russo
Florida Bar No. 174912
**GRAYROBINSON, P.A.**
333 S.E. 2nd Ave., Suite 3200
Miami, FL 33131
Tel : 305.416.6800
Fax : 305.416.6887
*francesca.russo@gray-robinson.com*

R. Troy Smith
Florida Bar No. 485519
**GRAYROBINSON, P.A.**
50 N. Laura Street, Suite 1100
Jacksonville, FL 32202
Phone: (904) 598-9929
Facsimile: (904) 598-9109
*troy.smith@gray-robinson.com*
*maria.daniels@gray-robinson.com*

- and –

By: /s/ Amy K. Van Zant

Amy K. Van Zant, *pro hac vice motion*
*forthcoming*
**ORRICK, HERRINGTON &**
**SUTCLIFFE LLP**
1000 Marsh Rd.
Menlo Park, California 94025
Tel: 650.614.7400
*avanzant@orrick.com*

#47599427 v1

Attorneys for Plaintiff